**JUICY WHIP, INC., Plaintiff–Appellant,**

**v.**

**ORANGE BANG, INC., Unique Beverage Dispensers, Inc., David Fox, and Bruce Burwick, Defendants–Appellees.**

**Nos. 01–1263, 01–1317.**

United States Court of Appeals, Federal Circuit.

DECIDED: June 7, 2002.

Ernie L. Brooks, Brooks & Kushman, P.C., of Southfield, MI, argued for plaintiff-appellant. With him on the brief were Frank A. Angileri and William G. Abbatt.

Jeffrey A. Schwab, Abelman, Frayne & Schwab, of New York, NY, argued for defendants-appellees. With him on the brief were Anthony A. Coppola and Richard L. Crisona.

Before MAYER, Chief Judge, LOURIE and LINN, Circuit Judges.

Opinion for the court filed by Circuit Judge LINN. Dissenting opinion filed by Chief Judge MAYER.

LINN, Circuit Judge.

Juicy Whip, Inc. ("Juicy Whip") appeals from a final judgment of invalidity and unenforceability of its U.S. Patent No. 5,575,405 ("the '405 patent"), entered by the United States District Court for the Central District of California on January 18, 2001, in favor of the defendants (collectively, "Orange Bang"). *Juicy Whip, Inc. v. Orange Bang, Inc.,* No. 96–08148 ABC (RNBx) (C.D.Cal. Feb. 21, 2001). We conclude that substantial evidence does not support the jury's verdict that the claims at issue are invalid as having been in prior public use. We also conclude that the

record does not support the inequitable conduct ruling. Accordingly, we reverse and remand.

## I. BACKGROUND

### A. The Invention

The '405 patent is entitled "Post–Mix Beverage Dispenser With an Associated Simulated Display of Beverage." Figure 1 of the patent depicts a beverage dispenser embodying the claimed invention, showing the countertop display bowl with its auxiliary equipment located below the counter and concealed from public view.

**Fig. 1**

As set forth in more detail in a previous appeal involving this suit, a "post-mix" beverage dispenser stores beverage syrup concentrate and water in separate locations until the beverage is ready to be dispensed. *See Juicy Whip, Inc. v.*

*Orange Bang, Inc.,* 185 F.3d 1364, 1365, 51 USPQ2d 1700, 1701 (Fed.Cir.1999) (*"Juicy Whip I "*). The syrup and water are mixed together immediately before the beverage is dispensed, which is usually after the consumer requests the beverage. In contrast, in a "pre-mix" beverage dispenser, the syrup concentrate and water are pre-mixed and the beverage is stored in a display reservoir bowl until it is ready to be dispensed. The display bowl is said to stimulate impulse buying by providing the consumer with a visual beverage display. A pre-mix display bowl, however, has a limited capacity and is subject to contamination by bacteria. It therefore must be refilled and cleaned frequently.

The invention claimed in the '405 patent is a post-mix beverage dispenser that is designed to look like a pre-mix beverage dispenser. The claims require the post-mix dispenser to have a transparent bowl that is filled with a fluid that simulates the appearance of the dispensed beverage and is resistant to bacterial growth. The claims also require that the dispenser create the visual impression that the bowl is the principal source of the dispensed beverage, although in fact the beverage is mixed immediately before it is dispensed, as in conventional post-mix dispensers.

The two claims at issue, claims 6 and 9, provide:

6. A method for inducing sales of a beverage to be dispensed from the outlet of a post-mix beverage dispenser, said method comprising the steps of:

positioning a transparent display bowl relative to the dispenser outlet to create the visual impression that said bowl is the reservoir and principal source from which a serving of the beverage is dispensed;

selecting a display fluid for said bowl which resists formation of organic growth and simulates the appearance of the dispensed beverage; and

visibly storing, without dispensing, a quantity of said fluid in said bowl to create the visual impression that multiple servings of the dispensed beverage are stored in said bowl for issuance from the outlet.

9. A beverage dispensing apparatus comprising:

a post-mix dispenser having a dispensing outlet for discharging beverage components in predetermined proportions to provide a serving of dispensed beverage; and

a transparent display container having no fluid connection with said outlet and visibly containing a quantity of fluid which simulates the appearance of said dispensed beverage, said fluid being resistant to organic growth;

said container being positioned relative to said outlet to create the visual impression that said container is the reservoir and principal source of said dispensed beverage issuing from said outlet; and

said container and said quantity of fluid visible within said container cooperating to create the visual impression that multiple servings of said dispensed beverage are stored within said container.

'405 patent, col. 12, ll. 49–63; col. 13, l. 1– col. 14, l. 2.

## B. The Prosecution History

The first of five applications leading to the '405 patent was filed at the United States Patent and Trademark Office ("PTO") on September 1, 1989. Throughout the prosecution history, the examiner rejected the invention as obvious over the prior art. To overcome these rejections, the inventors, Peter K. Stratton and Gus J. Stratton, submitted, among other

things, declarations from participants in the beverage industry directed toward the novelty, commercial success, and long-felt need of the patented invention. Among the declarations were one from Greg Boulahanis, a former employee of an Orange Bang distributor owned by the Strattons, and another from Joe W. Bowers, Jr., a former Coca–Cola Company employee who later joined Juicy Whip. Those two declarations became part of the focus of Orange Bang's inequitable conduct defense.

### 1. The Greg Boulahanis Declaration

The Boulahanis declaration was first submitted on October 31, 1990, as one of three declarations directed to the advantages of the patented invention and the problems with the prior art. The Boulahanis declaration states that he "worked for a distributor of Orange Bang" and was responsible for servicing, maintaining, and repairing pre-mix dispensers. He explained his experiences and the difficulties of cleaning and maintaining pre-mix dispensers. Specifically, he noted that some retailers were reluctant to clean the bowls thoroughly, and those who did often damaged the machines while cleaning them. He then described how he unsuccessfully tried to solve the problems associated with the pre-mix dispensers. He concluded by saying that no one in the industry solved those problems until Juicy Whip introduced its post-mix Tower Max II dispenser to the market.

After the submission of the declaration to the PTO, the examiner responded:

[t]he declaration of Greg Boulahanis has been considered. The declaration states affiant was an employee of a competitor of the company owning the rights to the instant invention. Affiant alleges the existing technology required the disadvantage of cleaning and, although attempted, could not be overcome in a manner acceptable to the industry until the appearance of the instant invention on the market which rendered unnecessary such cleaning and dis-assembly. Affiant fails to show a nexus between the problems of prior art dispensers and the emergence of the instant invention into the market, thus the declaration lacks probative value.

The examiner understood that Boulahanis was "an employee of a competitor of the company owning the rights to the instant invention." Boulahanis actually worked for a company called Omega Beverage, a company owned by the Strattons before they founded Juicy Whip. Omega Beverage was an Orange Bang distributor at the time that Boulahanis worked there. Thus, Boulahanis's statement that he "worked for a distributor of Orange Bang" was true. Despite the submission of the Boulahanis declaration, the examiner continued to reject the Strattons' claims as obvious over the prior art. The Strattons re-submitted the Boulahanis declaration two more times during the prosecution of the applications leading to the '405 patent, once on February 29, 1991, and again on May 2, 1995. Both times, they did not correct the examiner's apparent misunderstanding of the competitive posture of Boulahanis's employer.

### 2. The Joe Bowers Declaration

The Bowers declaration was submitted to the PTO in December 1994. At that time, Bowers was an employee of Coca–Cola USA (all Coca–Cola entities are herein referred to as "Coca Cola"). Prior to Bowers' declaration, Coca–Cola and Juicy Whip had entered into an agreement setting forth the terms and conditions of the purchase by Coca–Cola of 10,000 Juicy Whip machines over a five-year period. The agreement was subject to termination

if Juicy Whip abandoned the pending patent application.

The Bowers declaration states that in his capacity as the Manager of the Innovation Center with Coca–Cola, he read about Juicy Whip's new Tower Max dispenser, investigated the product, and arranged for the installation of fifty machines to be serviced by Coca–Cola. Bowers described the problems of the prior art machines and the difficulties associated with cleaning them. Bowers praised the Juicy Whip product, saying that the "Tower Max dispenser provided an important advance in fountain dispensing technology that would render conventional pre-mix storage display dispensers or bubblers obsolete." The declaration concludes by noting, "it would be absurd for any retailer of fountain beverages not to use the [Juicy Whip dispenser] in preference to any Bubbler now available."

After the Bowers declaration was filed, Coca–Cola, despite its earlier business relationship with Juicy Whip, filed a protest before the PTO under 37 C.F.R. § 1.291(a) against the issuance of the '405 patent. In that protest, Coca–Cola argued that some statements in the Bowers declaration were not true and that the invention was obvious. For example, while Bowers stated in his declaration that the Juicy Whip dispenser "solved the display bowl cleaning problem that had confronted Coca–Cola for more than 10 years," the protest contained a declaration from Coca–Cola's Manager of Postmix Sales Equipment, who declared that Coca–Cola technical personnel had not been asked to solve the cleaning problem, and if they had been, they would have solved it. The examiner rejected the Coca–Cola protest, noting that the Bowers declaration was given little weight. Furthermore, the examiner found that "[d]espite [Coca–Cola's] contention that the commercial success in the Bowers, Jr. declaration is untrue, the body of evidence in the file history of this application, and [Coca–Cola's] own comments acknowledging commercial success ... demonstrate commercial success which weighed in the patentability decision...." The '405 patent eventually issued on November 19, 1996.

## C. Procedural History

The case was tried to a jury following a remand from this court. *Juicy Whip I*, 185 F.3d at 1365, 51 USPQ2d at 1701. At trial, Orange Bang presented evidence that the patented invention was in public use more than one year prior to the filing of the application that led to the '405 patent. Specifically, it contended that defendant Orange Bang's owner and co-defendant, David Fox, made and sold two different types of anticipatory beverage dispensers—one around 1983 ("the 1983 dispenser") and the other in 1988 ("the 1988 dispenser").

As to the 1983 dispenser, it was contended that Fox converted a pre-mix dispenser into a post-mix dispenser by removing the pre-mix nozzle, plugging the remaining hole, and installing a post-mix valve arrangement in the base of the pre-mix dispenser. It was further argued that the following year, Fox shipped two of the converted dispensers to two Orange Bang distributors—Roller Beverage in Houston, Texas, and Energy Beverage in New York City. Mr. Patrick Goff, a salesperson for Jet Spray, Inc., a beverage dispenser manufacturer, testified that sometime between Spring 1983 and Summer 1984, he observed and operated a "retrofitted" beverage dispenser at the Houston distributorship. Defendant Bruce Burwick, co-owner of Unique Beverage with Fox and sole owner of Energy Beverage, testified that he placed the 1983 dispenser with a customer who was operating the food and

beverage concession at the Staten Island Zoo in New York City. The customer, Mr. Frank Cretella, testified that he used what he called the "makeshift" or "conversion" beverage dispenser in April 1984, but stopped using it after one month because the beverage was not refrigerated.

In addition to the evidence concerning the 1983 dispenser, Orange Bang presented evidence to suggest that, in 1988, Fox created another anticipatory device. Instead of taking a pre-mix dispenser and converting it to a post-mix dispenser, the 1988 dispenser was a post-mix dispenser with a clear bowl placed on top of it. It was argued that Orange Bang purchased these bowls from a Mr. John Massaro, the senior salesperson at an Orange Bang supplier. Massaro testified that he first sold acrylic bowls to Orange Bang in late 1987 or 1988. Fox allegedly shipped some of these 1988 dispensers to Burwick at the New York City distributor, Energy Beverage, who in turn placed the units with Cretella. Cretella, at that time, operated the Boathouse Restaurant in New York City. Cretella testified that he used the "modified tower" dispenser from May 1988 through the July 4th weekend of that year. Cretella had the dispenser removed after the bowl leaked all over his countertop.

Orange Bang further presented the testimony of another witness, Mr. Richard Stein, Orange Bang's operations manager. Stein testified that in 1984, he saw Fox in the Orange Bang service department with a post-mix dispenser base connected to a pre-mix dispenser. Stein further testified that in Spring of 1988, he and Fox met with Massaro to discuss the bowls to be used for the 1988 dispensers.

In total, six witnesses testified that they either saw or used the allegedly anticipatory beverage dispensers. The evidence also included sketches of the 1983 dispenser drawn by Goff and Cretella during their depositions for this case and a purchase order for the acrylic bowls used in the 1988 dispenser.

With regard to inequitable conduct, Orange Bang focused on the Bowers and Boulahanis declarations and on a March 11, 1988 letter drafted by Gus Stratton and addressed to the California Department of Health Services. The letter indicates that it is a follow-up to a phone conversation with a Department of Health Services employee regarding a " 'Fountain' type beverage dispenser with a clear bowl display above." Stratton expressed a concern that the department would have an objection to the dispenser because of potential consumer confusion. The letter says that a disclaimer sticker will be placed on the bowl indicating that the liquid in the clear bowl is "for advertising purposes only" and includes a sketch of a dispenser. At trial, Juicy Whip produced the original letter, and Gus Stratton testified that he never mailed it. Stratton had testified at his deposition that he had mailed it, but he retracted that statement after remembering that the department called him to tell him that he should contact a different agency. Stratton never provided the PTO with a copy of the letter.

The district court submitted the issue of inequitable conduct to the jury, asking them the following questions:

7. Did defendants prove by clear and convincing evidence that the Strattons obtained the '405 patent by withholding material information from the Patent Office?

8. Did defendants prove by clear and convincing evidence that the Strattons withheld material information from the Patent Office with the intent to mislead the patent examiner?

9. If your answer to Question 7 is YES *and* your answer to Question 8 is YES, weighing all of the circumstances,

did defendants prove by clear and convincing evidence that the Strattons engaged in inequitable conduct in the patent application process so that the patent should be invalidated?

In a special verdict, the jury answered each question in the affirmative. Following trial, Juicy Whip argued that the jury's decision was not binding, as it was an issue for the district court to decide. The district court concluded, based on the parties' representations in court and their submission of jury instructions on the issue, that the parties agreed to have the jury decide the inequitable conduct issue. The district judge noted that "the Court would not have instructed the jury on weighing or included Question 9 on the verdict form, if it had been the Court's intent to reserve the final decision on whether inequitable conduct justified invalidating the patent for itself." Because the district court believed that the jury's verdict was binding, it did not issue a separate decision on inequitable conduct.

The special verdict also included findings that: (1) claims 6 and 9 of the '405 patent are invalid under 35 U.S.C. § 102(b) based on prior public use; (2) defendants Orange Bang, Inc. and Unique Beverage Dispensers, Inc. willfully infringed and induced infringement of claims 6 and 9 of the '405 patent; and (3) defendant owners David Fox and Bruce Burwick did not induce infringement of the claims. In response to motions for judgment as a matter of law ("JMOL") under Rule 50(a) of the Federal Rules of Civil Procedure or, alternatively, a new trial under Rule 59(b), the district court upheld the entire jury verdict.

Juicy Whip appeals the district court's denial of its motions for JMOL and for a new trial on the issues of invalidity based on prior public use and inequitable conduct, and the district court's awarding of costs to the defendant. Neither party appeals any of the infringement or willful infringement determinations. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

### A. Standard of Review

■ . In reviewing the district court's denial of a JMOL, we reapply the district court's JMOL standard anew. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821, 23 USPQ2d 1426, 1431 (Fed.Cir.1992), *abrogated on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). A jury verdict on fact questions is reviewed to determine whether it is supported by substantial evidence. *Murray v. Laborers Union Local No. 324*, 55 F.3d 1445, 1452 (9th Cir.1995).

■ "Substantial evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed.Cir.1984) (internal quotations omitted). "A finding of fact must stand unless appellant shows that on the entirety of the evidence of record, including that which detracts from the weight of the favorable evidence, and taking into account the required quantum of proof, no reasonable juror could have made the finding." *Read*, 970 F.2d at 821, 23 USPQ2d at 1431 (citations omitted). Because a patent is presumed valid, the quantum of proof required at trial was clear and convincing evidence. 35 U.S.C. § 282 (1994) ("A patent shall be presumed valid.").

■ Whether or not an invention was in public use within the meaning of section

102(b) is a question of law, which is based upon underlying issues of fact. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 549, 16 USPQ2d 1587, 1591 (Fed. Cir.1990). Neither party disputes whether the alleged public use would amount to a public use as a matter of law. Therefore, to overturn the jury's finding of prior public use, Juicy Whip needed to show an absence of substantial evidence on the underlying facts supporting the jury's verdict.

■ With regard to inequitable conduct, "[t]here are a variety of ways in which the district court may choose to handle the issue of inequitable conduct during a jury trial." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1114, 40 USPQ2d 1611, 1614 (Fed.Cir. 1996) (citing *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 541, 16 USPQ2d 1622, 1624 (Fed.Cir.1990)). Here, the district court submitted the issue of inequitable conduct to the jury. When an ultimate question of law or fact is decided by the jury, on review it is assumed that the jury resolved the evidentiary facts as appropriate to support the verdict. *Hebert*, 99 F.3d at 1114–15, 40 USPQ2d at 1614; *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765, 9 USPQ2d 1417, 1423 (Fed.Cir. 1988) ("Judges must accept the factual findings, presumed from a favorable jury verdict, which are supported under the substantial evidence/reasonable juror standard.").

■ On appeal of the jury's verdict of unenforceability due to inequitable conduct, we ascertain whether the presumed factual findings of material withholding and deceptive intent were supported by substantial evidence at the trial. We determine whether there was substantial evidence whereby a reasonable jury could have reached its verdict on the entirety of the record and in light of correct instructions on the applicable law. *Sun Studs,*

*Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 982, 10 USPQ2d 1338, 1341 (Fed.Cir. 1989). Thus, to sustain its motion for JMOL on its evidentiary challenge to the inequitable conduct issue, Juicy Whip needed to show an absence of substantial evidence supporting the jury's finding that Orange Bang had established unenforceability by clear and convincing evidence.

## B. Prior Public Use

■ On appeal, Juicy Whip argues two different reasons in support of its position that the record is devoid of substantial evidence rising to the level of the clear and convincing evidence necessary to invalidate its patent based on prior public use under 35 U.S.C. § 102(b). First, it argues that the evidence does not establish that the alleged anticipatory dispensers included elements corresponding to all the limitations of the claims at issue. Second, it contends that the oral testimony provided by the six witnesses was uncorroborated, and thus does not rise to the clear and convincing evidence necessary to establish a prior public knowledge or use. Orange Bang argues that the verdict is supported by substantial evidence and that its evidence of prior public use need not be completely corroborated by a writing.

■ A person shall not be entitled to a patent if "the invention was … in public use … more than one year prior to the date of the application for patent." 35 U.S.C. § 102(b) (1994). When the asserted basis of invalidity is prior public use, the party with the burden of proof must show that "the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention." *Scaltech Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1383, 51 USPQ2d 1055, 1058 (Fed.Cir.1999). Generally, oral testimony of prior public use must be corroborated in order to invalidate

a patent. *See Finnigan Corp. v. Int'l Trade Comm'n,* 180 F.3d 1354, 1366–68, 51 USPQ2d 1001, 1010–11 (Fed.Cir.1999).

Orange Bang did not present an element-by-element comparison between the 1983 and 1988 dispensers and the asserted claims. Moreover, the jury's verdict is not broken down by claim limitations. The verdict only indicated that "the asserted claims are invalid because the invention described in the claims of the '405 patent was in public use prior to September 1, 1988." This court is tasked with determining whether substantial evidence supports the jury's findings. Specifically, did Orange Bang present substantial evidence satisfying its clear and convincing burden of proof that it or its customers publicly practiced every limitation of method claim 6, and publicly used a dispenser with elements corresponding to each limitation of apparatus claim 9 more than a year before the filing date of the '405 patent?

Our review of the record shows a lack of substantial evidence supporting the jury's finding of invalidity under 35 U.S.C. § 102(b). We conclude that, on the record, no reasonable juror could have found that Orange Bang established—by clear and convincing evidence—that the 1983 and 1988 dispensers were complete embodiments of the claimed invention. Specifically, the record lacks substantial evidence regarding at least one limitation of each asserted claim. Claim 6 is directed to a "method for inducing sales of a beverage" comprising the step of "positioning a transparent display bowl relative to the dispenser outlet to create the visual impression that said bowl is the reservoir and principal source from which a serving of the beverage is dispensed." '405 patent, col. 12, ll. 53–56. Claim 9 requires that the dispenser be "positioned relative to said outlet to create the visual impression that said container is the reservoir and princi-

pal source of said dispensed beverage issuing from said outlet." '405 patent, col. 13, ll. 10–13. While the record contains testimony from several witnesses which, if believed by the jury, indicates that some of the claim limitations were found in the 1983 and 1988 dispensers, the record is devoid of evidence showing that the above limitations were found in either dispenser.

Defendant Bruce Burwick testified at length about his involvement with the 1983 dispenser and his placing the dispenser with a customer in New York. Burwick's testimony provides the closest support for Orange Bang's invalidity contentions:

Q: Now, as you know sir, this case involves, this post-mix dispenser with a bowl, and a liquid that is not dispensed that simulates the beverage and gives a visual impression that the liquid that you see is not what you are getting.

A: I know that that is what the case is about.

Q: What is your earliest knowledge of a dispenser which, in your judgment would have these features?

＊ ＊ ＊ ＊ ＊ ＊

A: Well, I was speaking to Dave Fox and he had described to me that he had taken a—excuse me—a pre-mix dispenser, a Starline which—what I knew about Starlines was they also contained just like a Jet Spray a five-gallon bowl or reservoir and what he had done is said he had a fluid like an antifreeze fluid that there would be no spoilage but looked like his fruit punch Ole drink in color and he said, "You know, I made this fluid and I put a post-mix valve," which to me would be a valve just like similar to the machine right next to the single bowl pre-mix Starline.

That was a fountain machine. And with my experience, those are like post-mix valves.

＊ ＊ ＊ ＊ ＊ ＊

And he installed that on the front panel of the Starline machine and he said he connected a water line to the back of the valve from the inside and a syrup line and he said it would be able to give a continuous volume from a bag in the box or a five-gallon tank which were both available at the time and that it would refrigerate the anti-freeze product that was in the bowl so that the bowl would still look cold.

And he told me that this is what he did. He said how would you like to try one?

\* \* \* \* \* \*

Q: Now you have this piece of equipment in New York. What did you do with it?

\* \* \* \* \* \*

A: Well, I offered it to Frank Cretella who was a customer of mine at the Staten Island Zoo concession stand for a year....

\* \* \* \* \* \*

Q: Did the dispenser have any indication on it that that is the drink that was going to be dispensed?

\* \* \* \* \* \*

A: It had on—I believe it had on all four sides of it like this machine has four sides, the single Starline, it has a see-through six by 10 decal, six inches wide—I think six inches wide by 10 inches high see-through decal that said punch Ole.

\* \* \* \* \* \*

Q: I see. And did it draw drinks?
A: Yes.
Q: And could the public see it?
A: Well, it was right on the main concession stand where any person that walked into the Staten Island Zoo concession, it was more than a food conces-

sion. It was a concession that sold zoo souvenirs and mementoes of your trips to the zoo and it was right there. The fruit punch Ole.

Q: Did Mr. Cretella understand that it was a post-mix, there were lines and he didn't have to fill the bowl?
A: He knew he didn't have to fill the bowl.

Burwick's testimony does not amount to clear and convincing evidence that the bowl was positioned "to create the visual impression that said bowl is the reservoir and principal source from which a serving of the beverage is dispensed." When asked directly about the claim limitation at issue, Burwick replied, "I know that that is what the case is about." When asked whether the dispenser had any indication of what beverage was going to be dispensed, Burwick testified that stickers on the side of the dispenser showed what beverage consumers would get. Claim 6, however, requires that the positioning of the bowl "create[s] the visual impression that said bowl is the reservoir and principal source from which a serving of the beverage is dispensed." Burwick's testimony does not substantiate that limitation. Moreover, Burwick's testimony regarding stickers on the side of the bowl does not satisfy the limitation in claim 9 requiring that the bowl "create the visual impression that said container is the reservoir and principal source of said dispensed beverage issuing from said outlet."

The testimony from defendant Fox likewise failed to establish that the alleged prior art dispensers satisfied these disputed claim limitations. When asked about his conception of the 1988 dispenser, Fox testified that he had the idea of "getting some plastic bowls made and putting in a liquid that would represent the beverage. If it was Orange Bang it would be orange. If it was Punch Bang, it would be red...."

While this testimony may show that the 1988 dispenser had a bowl of colored liquid on top of it, the claims require more. The testimony fails to prove that the bowl created the visual impression that it functioned as the source of the beverage being dispensed. In fact, Fox was specifically asked whether consumers would notice that the beverage was flowing from a post-mix valve instead of straight from a pre-mix bowl:

> Q: I know it was a post-mix valve instead of a pre-mix valve, but just looking at it, it would look pretty much as it looks here, except it had this rod across the top, right?
>
> A: Well, being that I'm in the business, I would recognize the post-mix valve if I saw that piece of equipment.
>
> Q: Do you think the consumer of a beverage would have recognized that?
>
> A: Possibly.

Thus, the testimony of the defendants failed to show that that consumers would think that the bowl was the principal reservoir of the beverage being dispensed.

Even if the testimony at trial were sufficient to correlate each element of the alleged anticipatory dispensers with each claim limitation, this court must still ascertain whether that type of evidence was adequate to support the jury's finding. Historically, courts have looked with disfavor upon finding anticipation with only oral testimony. In *The Barbed Wire Patent*, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1892), the Supreme Court commented on the dangers of invalidating a patent on oral testimony alone.

> In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts

have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory and beyond a reasonable doubt. Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information.

*Id.* at 284, 12 S.Ct. 443.

*The Barbed Wire Patent* involved a dispute over the novelty of a patent for barbed wire. Twenty-four witnesses testified on behalf of an accused infringer that they had seen an anticipating barbed wire fence exhibited by one Morley at an 1858 or 1859 county fair at Delhi in Delaware County, Iowa. *Id.* at 285, 12 S.Ct. 443. The witnesses included a boy who had been thrown against the fence and cut by the extruding barbs; a deputy marshal who hitched his horse to a fence post near the barbed wire fence and returned to find the horse's nose and breast bloodied by the barbs; and a fair attendee named Potter who saw an exhibit of the fence and was given a sample of the wire by Morley. Potter testified that he kept the sample in a trunk for more than ten years and then produced the sample at trial. *Id.* at 286–87, 12 S.Ct. 443. Potter's son, however, testified for the patentee and contradicted his father's testimony, saying that no such barbed wire was kept in the trunk. The patentee also presented evidence including two copies of the Delaware Journal which listed the notice of the fair, but did not mention Morley or his fence. The district court discounted both that evidence and the testimony from the patentee's witnesses who attended the fair but had seen "nothing of the Morley fence." *Washburn & Moen Mfg. Co. v. Beat 'Em All Barb–Wire Co.*, 33 F. 261, 270–71 (C.C.N.D.Iowa 1888). The district court found that it was unlikely that all twenty-four witnesses

were lying and declared the patent invalid. *Washburn & Moen Mfg.*, 33 F. at 272 ("Not only is there an entire lack of evidence to show that such a nefarious plan had been undertaken, but no motive can be conceived of, that would induce so large a number of well-known persons to engage in such a conspiracy."). Despite the testimony of twenty-four witnesses and the credibility determinations made by the trial court, the Supreme Court reversed, noting:

> [T]he very fact ... that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence, and to demand that it be subjected to the closest scrutiny.

*The Barbed Wire Patent*, 143 U.S. at 284–85, 12 S.Ct. 443.[1]

■ The Court later clarified that the high standard of proof required when using oral testimony to prove prior public use was not "beyond a reasonable doubt" as stated in *The Barbed Wire Patent*, but was nevertheless a high threshold. *See Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed. 523 (1923) ("The temptation to remember in such cases and the ease with which honest witnesses can convince themselves after many years of having had a conception at the basis of a valuable patent, are well known in this branch of law, and have properly led to a rule that evidence to prove prior discovery must be clear and satisfactory."). In light of this high standard, this court's predecessor adopted a list of factors for evaluating the credibility of oral statements. *See In re Reuter*, 670 F.2d 1015, 1021 & n. 9, 210 USPQ 249, 255 & n. 9 (CCPA 1981). Those factors include: (1) delay between event and trial, (2) interest of witness, (3) contradiction or impeachment, (4) corroboration, (5) witnesses' familiarity with details of alleged prior structure, (6) improbability of prior use considering state of the art, (7) impact of the invention on the industry, and (8) relationship between witness and alleged prior user. *Id.* (citing *E.I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1261 n. 20, 205 USPQ 1, 11 n. 20 (8th Cir.1980)). This court, especially in the context of proving priority of invention, has analyzed this corroboration requirement with a "rule of reason" analysis. *See Price v. Symsek*, 988 F.2d 1187, 1195, 26 USPQ2d 1031, 1037 (Fed.Cir.1993).

In *Woodland Trust v. Flowertree Nursery*, 148 F.3d 1368, 47 USPQ2d 1363 (Fed. Cir.1998), this court, relying on *The Barbed Wire Patent*, reversed a finding of prior public knowledge and use based solely on uncorroborated oral testimony.

---

1. The dissent distinguishes this case from *The Barbed Wire Patent* because, unlike this case, that case involved an invention that was "a subtle improvement over the prior art that would be easily missed by anyone other than a keen observer skilled in the art." The record of the trial proceedings in *The Barbed Wire Patent* reveals that among the twenty-four witnesses who testified that they had seen the claimed barbed wire fence several years prior to the application at issue, some of the witnesses were skilled in the art. *Washburn & Moen Mfg.*, 33 F. at 268. For example, one of the witnesses, H.L. Bates, was a blacksmith who attended the county fair with Morley and helped Morley put the barbed wire fence in place for the exhibition. *Id.* Bates testified at trial that he made the tools with which the wires were twisted to form the barbs. *Id.* During a recess in the trial, Bates made a set of tools which were then entered into evidence and used in a courtroom demonstration showing that the claimed barbed wire could be made with those tools. *Id.*

There, the patentee owned a method patent for protecting a plot of foliage plants from freezing, which established an insulating covering of ice over ground level watering. The accused infringer presented oral testimony from four interested witnesses that the method was previously known and used by each of Joseph Burke and William Hawkins at their respective nurseries in Florida. Hawkins' son testified that his father's nursery was destroyed by a tornado in 1978 and not rebuilt until after the patent issued. Burke testified that he used the patented system, but tore it down in 1976. The district court credited the statements of the accused infringer's witnesses, held the patent invalid, and noted that "to discredit those witnesses in this case the court would be obliged to conclude that all four were deliberate perjurers." *Id.* at 1369–70, 47 USPQ2d at 1364–65. This court reversed, holding that "uncorroborated oral testimony, particularly that of interested persons recalling long-past events, does not, of itself, provide the clear and convincing evidence required to invalidate a patent on this ground." *Id.* at 1369, 47 USPQ2d at 1364. Specifically, the court noted that on the facts presented, in light of the absence of any written corroboration and the length of time between the anticipating events and the trial, the oral evidence alone was insufficient to invalidate the patent:

> The Supreme Court's view of human nature as well as human recollection, whether deemed cynical or realistic, retains its cogency. This view is reinforced, in modern times, by the ubiquitous paper trail of virtually all commercial activity. It is rare indeed that some physical record (e.g., a written document such as notes, letters, invoices, notebooks, or a sketch or drawing or photograph showing the device,

a model, or some other contemporaneous record) does not exist.

*Id.* at 1373, 47 USPQ2d at 1367.

The following year, in *Finnigan Corp. v. International Trade Commission,* 180 F.3d 1354, 51 USPQ2d 1001 (Fed.Cir. 1999), this court held that concerns regarding corroboration are not limited to "interested" witnesses. *Id.* at 1367–68, 51 USPQ2d at 1011. Finnegan was the assignee of a patent pertaining to a method for using a "quadruple ion trap" to generate a mass spectrum of a trapped sample. This court held that the claim limitations at issue required the use of a nonresonance ejection. *Id.* at 1363–64, 51 USPQ2d at 1007–08. The Commission found that the claimed invention had been the subject of prior use by an uninterested witness, Keith B. Jefferts. Jefferts authored an article that disclosed all claim limitations with the exception of the required use of a nonresonance ejection. Jefferts testified before the Commission that he practiced every limitation of the claimed invention, including the limitation missing from his article, more than one year before the filing date of the patent at issue. *Id.* at 1364–66, 51 USPQ2d at 1008–10. Jefferts's testimony was the only evidence of the limitation missing from his article and was uncorroborated by any other testimony or evidence in the record. This court reversed the Commission, holding that under the circumstances of the case before it, the oral testimony alone was insufficient to establish prior public use:

> In the end, what we are left with is Jefferts' testimony concerning his alleged public use. Such evidence is insufficient as a matter of law to establish invalidity of the patent. This is not a judgment that Jefferts' testimony is incredible, but simply that such testimony alone cannot surmount the hurdle that the clear and convincing evidence stan-

dard imposes in proving patent invalidity. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577, 38 USPQ2d 1288, 1291 (Fed.Cir.1996) (noting that the corroboration rule, "provides a bright line for both district courts and the PTO to follow ...").

*Id.* at 1370, 51 USPQ2d at 1012.

Here, applying the *Reuter* factors, we conclude that the evidence presented by Orange Bang was insufficient as a matter of law to surmount the clear and convincing evidence hurdle. The testimony about the 1983 and 1988 dispensers came more than eight and twelve years, respectively, after the witnesses saw the dispensers. Cretella, the only witness to use the dispensers to serve drinks in public, kept the 1983 dispenser for only one month and the 1988 dispenser for less than three months. None of the six witnesses can be said to be disinterested. Two of the witnesses, Fox and Burwick, are defendants in the case. Stein was the operations manager for the defendant Orange Bang. Cretella was a long-time customer of Burwick, and Burwick was a shareholder in a group of restaurants operated by Cretella. Goff, the former beverage dispenser manufacturer, had known Fox since 1977 and had a business relationship with Fox's brother-in-law. Finally, Massaro, the maker of the acrylic bowls for the 1988 dispenser, was the senior salesperson for a company that sold products to Orange Bang the same year as the lawsuit. The six witnesses are sufficiently inter-connected to consider them "interested witnesses" in the context of the *Reuter* factors. *See Oney v. Ratliff*, 182 F.3d 893, 896, 51 USPQ2d, 1697, 1700 (Fed.Cir.1999) ("The uncorroborated oral testimony of [the accused infringer], as the inventor, and his close associates would be insufficient to prove invalidity.").

The one writing proffered to corroborate the oral testimony in this case is inadequate to meet the applicable standard of proof. Reliable evidence of corroboration preferably comes in the form of physical records that were made contemporaneously with the alleged prior invention. *See Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350–51, 60 USPQ2d 1091, 1094 (Fed.Cir.2001) ("Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been corroborated." (citing *Woodland Trust*, 148 F.3d at 1373, 47 USPQ2d at 1367)). Here, the sketches of the 1983 dispenser were not drawn by Goff and Cretella until their depositions in this case. Thus, they are no more reliable than the oral testimony accompanying the drawings. The purchase order for clear bowls corroborates the witnesses' testimony that Orange Bang purchased clear bowls from Massaro but still leaves the record devoid of any evidence that the bowls, even if placed upon a post-mix dispenser, created the visual impression that the bowl was the reservoir and principal source from which a serving of the beverage was dispensed.[2] We do not conclude that the witnesses below were not credible. Rather, with the guidance of precedent cautioning against the reliance on oral testimony alone, we hold that the evidence of record did not provide the clear and convincing evidence necessary to invalidate the patent for prior public knowledge. The district court, therefore, erred by denying Juicy Whip's motion for JMOL on anticipation.

---

**2.** The dissent focuses on a demonstration by Fox before the jury using a Starline pre-mix dispenser. However, this testimony is no more reliable than any of the other oral testimony, bearing in mind that the *Reuter* factors do not include a category for oral testimony accompanied by an admittedly non-anticipatory visual aid.

## C. Inequitable Conduct

On appeal, Juicy Whip argues that nothing in the Boulahanis or Bowers declarations is false or misleading, and to the extent that any part is misleading, those parts are immaterial. In addition, Juicy Whip argues that Orange Bang failed to present substantial evidence of intent to deceive the PTO. With respect to the Stratton letter, Juicy Whip contends that it is not prior art and not relevant to any issue relating to patentability. Orange Bang responds by arguing that the record supports the inequitable conduct finding by the jury. Specifically, it argues that both the Boulahanis and Bowers declarations were material and misleading. Furthermore, by failing to provide the PTO with a copy of the Gus Stratton letter addressed to the California Department of Health Services, Orange Bang argues that the Strattons withheld information that a reasonable examiner would consider material.

 Inequitable conduct entails a two-step analysis: first, a determination of whether the withheld reference meets a threshold level of materiality and intent to mislead, and second, a weighing of the materiality and intent in light of all of the circumstances to determine whether the applicant's conduct is so culpable that the patent should be unenforceable. *See generally GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1273–74, 60 USPQ2d 1141, 1143 (Fed.Cir.2001). Both intent and materiality are questions of fact. *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1327, 47 USPQ2d 1225, 1228–29 (Fed.Cir.1998). "The more material the omission, the less culpable the intent required, and vice versa." *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1439, 17 USPQ2d 1834, 1838 (Fed.Cir.1991). The challenged conduct must be sufficient to require a finding of deceitful intent in light of all the circumstances. *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 873, 9 USPQ2d 1384, 1389 (Fed. Cir.1988) (en banc in relevant part).

 We conclude that the record is devoid of substantial evidence rising to the level of the clear and convincing evidence necessary to render the patent unenforceable. Specifically, Orange Bang failed to present substantial evidence of materiality regarding the Boulahanis declaration and Stratton letter or of intent to mislead regarding the Bowers declaration. We begin with the Boulahanis declaration. It is undisputed that every statement in the declaration is a true statement. Boulahanis was, in fact, a former employee of an Orange Bang distributor. It was perhaps misleading, however, for the Strattons to re-submit the declaration knowing that the examiner misunderstood by whom Boulahanis was employed. However, to the extent that the declaration was misleading the second and third times it was submitted, the misleading part of the declaration was not material to the declaration or the application. The declaration was directed to the problems in the prior art and the advances of the Strattons' invention. Orange Bang acknowledges that the problems raised by Boulahanis, such as the difficulty in cleaning the pre-mix dispensers, were indeed problems that were solved by the Strattons' invention. Every statement in the declaration relating to the claimed invention is true. The relevant inquiry before the examiner was whether the claimed invention solved a long-felt need, not who said the invention solved the long-felt need. While the court is bothered by the Strattons' failure to correct the examiner's misunderstanding, the clarified identity of Boulahanis's employer was immaterial to the issue before the examiner.

Likewise, the submission of the Bowers declaration cannot serve as the source of an inequitable conduct finding. In its appellate brief, Orange Bang argues that the Bowers declaration "misrepresented the commercial success of the Strattons' dispensers by the Coca–Cola company" and "unquestionably contained false information." However, Orange Bang does not identify any specific statements in the declaration that it contends Juicy Whip knew to be false. The jury had before it the Coca–Cola protest, which points to a number of statements in the declaration that it contended were false statements. The protest ultimately failed, with the examiner noting that the Bowers declaration is supported by other declarations of Coca–Cola managers. Whether the statements in the Bowers declaration were false or misleading is irrelevant to our inquiry, however, because Orange Bang failed to present any evidence that the Strattons knew or considered the Bowers declaration to contain anything untrue or that the declaration was submitted with any intent to mislead the examiner.

In his declaration, Bowers discusses his personal opinions of the state of the beverage dispensing industry and the happenings within Coca–Cola regarding their problems associated with beverage dispensing equipment. The record reflects a disagreement between Bowers and Coca–Cola over what was happening within Coca–Cola. The record does not reflect, however, that the Strattons knew that anything in the Bowers declaration was false or misleading at the time they submitted it to the PTO. Proving that the Bowers statements were false or misleading, without accompanying proof of an intent to mislead, falls short of the showing needed to support a finding of inequitable conduct. Orange Bang had the burden at trial of proving by clear and convincing evidence that the Strattons acted with an intent to mislead the examiner. At the time the Strattons submitted the Bowers declaration, Coca–Cola had ordered 10,000 machines from Juicy Whip. Furthermore, several other Coca–Cola executives submitted affidavits on behalf of Juicy Whip. The only evidence Orange Bang points to for support of its theory of intent to mislead is the fact that Juicy Whip hired Bowers nearly two years after his declaration. That alone is not substantial evidence supporting a finding of an intent to mislead. No reasonable juror could conclude that the Strattons submitted the Bowers declaration with an intent to mislead the patent examiner.

Finally, the draft of the letter from Gus Stratton to the California Department of Health Services is immaterial as a matter of law. The letter is not a complete description of the claimed invention and is not otherwise prior art. Orange Bang argues that in light of Gus Stratton's belief that a disclaimer was necessary to dispel consumer confusion, a reasonable examiner may have considered this information material. However, this court in *Juicy Whip I* rejected Orange Bang's contention that the claimed invention lacked utility under 35 U.S.C. § 101 because its purpose was to deceive the public. *Juicy Whip I*, 185 F.3d at 1366–68, 51 USPQ2d at 1702–03. Because an invention's deceptive nature has no bearing upon its utility, no examiner could conclude that the letter was material to patentability.

Because neither of the two declarations nor the Stratton letter meets the threshold level of materiality or intent to mislead, we need not weigh the materiality and intent in light of all the circumstances to determine whether the Strattons' conduct was so culpable that the patent should be unen-

forceable. The judgment of inequitable conduct, therefore, must be set aside.[3]

## III. CONCLUSION

For the foregoing reasons, we reverse the district court's denial of Juicy Whip's motions for JMOL on the issues of anticipation and inequitable conduct. Further, we vacate the award of costs and remand the case for a determination of damages. On remand, the district court will have discretion, based on the jury's finding of willfulness not contested in this appeal, to determine whether to enhance damages under 35 U.S.C. § 284.

*REVERSED–IN–PART, VACATED–IN–PART, AND REMANDED.*

MAYER, Chief Judge, dissenting.

Because the jury's finding of prior public use under 35 U.S.C. § 102(b) was supported by substantial evidence, I would affirm the district court's holding that U.S. Patent No. 5,575,405 is invalid.

During trial, Orange Bang attempted to establish that its owner, David Fox, had constructed and publicly used a beverage dispenser that fully anticipated the claimed invention. To that end, it presented the testimony of six witnesses: David Fox, Bruce Burwick, Patrick Goff, Frank Cretella, John Massaro, and Richard Stein. The court states that Orange Bang failed to present sufficient evidence that the anticipating device possessed each and every limitation of the claims at issue. Specifically, the court says the evidence was insufficient as to the limitation of claim 6 requiring "positioning a transparent display bowl relative to the dispenser outlet to create the visual impression that said

bowl is the reservoir and principal source from which a serving of the beverage is dispensed," and the limitation of claim 9 that requires that the dispenser be "positioned relative to said outlet to create the visual impression that said container is the reservoir and principal source of said dispensed beverage issuing from said outlet." *Ante*, at 738–39. However, I believe the court fails to appreciate the presentation conducted by David Fox. Consequently, it erroneously concludes that no reasonable jury could reach the result that it did.

During trial, Orange Bang brought a Starline pre-mix dispenser (Exhibit 64) into the courtroom. A Starline pre-mix dispenser is common in the marketplace and has a clear plastic bowl positioned above the dispenser outlet. From the counter up, it closely resembles the dispenser depicted in Figure 1 of the '405 patent. *Ante*, at 731. Counsel then asked Fox to explain to the jury how he converted this pre-mix dispenser to a post-mix dispenser.

Q. BY MR. SCHWAB: Could you explain to the jury using exhibit [64] … what you did, sir.

A. Yes

What I did was, I took this nozzle off of the dispenser and in the case of dispensers like this it had a spacer.

Now, the reason it had a spacer that was about an inch long, wide or long, was so that this part would come out a little further to accommodate a whipping chamber here so the product could go down.

---

**3.** A district court operates within its discretion when it instructs the jury to find and weigh the facts surrounding the inequitable conduct defense and to decide the ultimate question of inequitable conduct. *See Hebert*, 99 F.3d at 1114, 40 USPQ2d at 1614. In light of our disposition on the inequitable conduct issue, we do not reach Juicy Whip's contention that the district court erred by making the jury finding binding upon the parties.

So when I took off the spigot it had a spacer which was screwed into the bolt and that spacer had a little hole in it, about a quarter of an inch.

So when you pulled the handle, the fluid would go through the little hole and come down into the cup.

So I plugged that hole with silicone and so that the liquid in the bowl would not come out.

And below it I put on a valve, a small little valve on the front of it and· then attached two conduits, one for water and one for syrup.

And that was where it would connect to a water line and the bag and box and this little valve had a lever on it.

You pushed the lever, activated the bag and box system and brought the product to the head and with the little funnel into the cup.

The technology and claims at issue are not complex. As Fox was describing to the jury the steps that he undertook to retrofit the Starline dispenser, it could have quite easily determined for itself, as it must have done, that the display bowl was positioned relative to the dispenser outlet to create the visual impression that the bowl is the reservoir and principal source from which a serving of the beverage is dispensed. We were not present for this demonstration and it was not recreated for us at oral argument, nor should it have been. The jury is the ultimate finder of fact and to second guess it in the manner that has been done here substantially invades its province. *See Bio–Tech. Gen. Corp. v. Genentech, Inc.,* 267 F.3d 1325, 1330, 60 USPQ2d 1430, 1434 (Fed.Cir. 2001).

Fox's testimony was not the only evidence presented on these claim limitations. As the court sets forth in detail, Burwick testified that Fox had described to him what he had done, specifically, converting a pre-mix Starline dispenser to a post-mix dispenser. *Ante,* at 738–40. Goff testified that he observed and operated the retrofitted dispenser at the Houston distributorship in the spring of 1983 and summer of 1984. Cretella testified that he used the dispenser in April of 1984. Stein testified that he saw Fox working on the retrofitted dispenser in 1984. The jury saw Fox's demonstration, was aware of what a converted Starline dispenser looked liked, and heard the additional testimony of the other witnesses. It was well within their province to determine that the manner in which the device had been converted would create the visual impression that the bowl is the reservoir and principal source from which a serving of the beverage is dispensed.

The court continues that even if Orange Bang had presented evidence of all of the limitations, the result would have been the same because of a lack of corroboration. I respectfully disagree.

While the six witnesses presented by Orange Bang may have been interested in the outcome to varying degrees, the level of interest is only one of the eight factors set out in *In re Reuter,* 670 F.2d 1015, 1021 & n. 9, 210 USPQ 249, 255 & n. 9 (CCPA 1981), testimony as to all of which was before the jury. This is not a situation like *Finnigan Corp. v. Int'l Trade Comm'n,* 180 F.3d 1354, 51 USPQ2d 1001 (Fed.Cir.1999), where only one witness testified, or *Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed–Wire Co.,* 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1892), where, while 24 witnesses testified, the invention at issue was a subtle improvement over the prior art that would be easily missed by anyone other than a keen observer skilled in the art. At issue here was a drink dispenser, whose claimed elements were easily discernible. Moreover, the witnesses who testified were experi-

enced in the industry and understood the state of the art àt the time that Fox retrofitted the Starline dispenser. The jury was aware of all of the detracting factors that might call into question their testimony and it still found the patent invalid. To decide on appeal, without having seen the witnesses, that the testimony was insuffi- cient as a matter of law is a distortion of our role in the judicial process.